# 24-2852-CV

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

———— ◆ ————

RHONDA AMBRISTER, AS LEGAL GUARDIAN OF R.D. AND INDIVIDUALLY,

*Plaintiff-Appellant,*

–against–

DAVID C. BANKS, IN HIS OFFICIAL CAPACITY AS CHANCELLOR OF NEW
YORK CITY DEPARTMENT OF EDUCATION,
NEW YORK CITY DEPARTMENT OF EDUCATION,

———————— *Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-APPELLANT

RORY J. BELLANTONI
BRAIN INJURY RIGHTS GROUP, LTD.
300 East 95th Street, Suite 130
New York, New York 10128
(646) 850-5035
rory@pabilaw.org

*Attorneys for Plaintiff-Appellant*

# **TABLE OF CONTENTS**

*Page(s)*

TABLE OF AUTHORITIES ................................................................... i

JURISDICTIONAL STATEMENT ....................................................... 1

Basis for the District Court's Jurisdiction .................................. 1

Basis for this Court's Jurisdiction ............................................. 1

Timeliness of the Appeal ............................................................ 1

Assertion of this Court's Jurisdiction ........................................ 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............. 2

STATEMENT OF THE CASE ............................................................. 2

The Impartial Hearing Officer Proceedings .............................. 3

The State Review Officer's Decision ......................................... 5

The District Court Proceedings ................................................. 6

STATEMENT OF FACTS ................................................................... 9

SUMMARY OF THE ARGUMENT ..................................................... 12

ARGUMENT .................................................................................... 16

1. STANDARD OF REVIEW .......................................................... 16

II. IDEA FRAMEWORK ................................................................. 16

III. DEFENDANTS DENIED R.D. A FAPE FOR THE 2021-22 AND 2022-23 SCHOOL YEARS ............................................................. 19

    A. The February 2022 IEP was Procedurally Defective ................. 19

1. Defendants failed to timely provide a school location ................... 19

2. DOE predetermined that it would not provide music therapy ........ 26

B. The February 2022 IEP was Substantively Inadequate ............................ 32

1. Specific Services ........................................................... 33

2. Air Conditioning and provision of related services ....................... 37

C. Horan was Inappropriate ........................................................... 40

IV. iBRAIN AS AN APPROPRIATE UNILATERAL PLACEMENT FOR R.D. . 48

A. R.D.'s Placement at iBRAIN Aligns with the Legal Standard
Under IDEA ..................................................................... 50

B. Judicial and Administrative Acknowledgment of iBRAIN's
Appropriateness ................................................................ 51

V. EQUITIES FAVOR FULL REIMBURSEMENT OF TUITION AND
SERVICES FOR R.D. AT iBRAIN .................................................. 52

CONCLUSION ..................................................................... 55

# TABLE OF AUTHORITIES

*Page(s)*

## Cases

*A.C. ex rel. M.C. v. Bd. of Educ. of The Chappaqua Cent. Sch. Dist.*,
    553 F.3d 165 (2d Cir. 2009) .................................................................. 19

*Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*,
    458 U.S. 176 (1982) .................................................................. 17, 19, 50

*C.F. ex rel. R.F. v. New York City Dep't of Educ.*,
    746 F.3d 68 (2d Cir. 2014) .................................................................. 39

*C.L. v. Scarsdale Union Free Sch. Dist.*,
    744 F.3d 826 (2d Cir. 2014) .................................................................. 22

*C.U. v. New York City Dep't of Educ.*,
    23 F. Supp. 3d 210 (S.D.N.Y. 2014) .................................................... 20

*Cerra v. Pawling Cent. Sch. Dist.*,
    427 F.3d 186 (2d Cir. 2005) ............................................................ 17, 33

*D.C. ex rel. E.B. v. New York City Dep't of Educ.*,
    950 F. Supp. 2d 494 (S.D.N.Y. 2013) .................................................. 46

*Deal v. Hamilton Cnty. Bd. of Educ.*,
    392 F.3d 840 (6th Cir. 2004) ............................................................ 31, 32

*E.H. v. New York City Dep't of Educ.*,
    164 F. Supp. 3d 539 (S.D.N.Y. 2016) .................................................. 23

*Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-*,
    580 U.S. 386 (2017) ........................................................................ 36, 45

*F.O. v. New York City Dep't of Educ.*,
    976 F. Supp. 2d 499 (S.D.N.Y. 2013) ................................................ 33, 34

*Florence Cnty. Sch. Dist. Four v. Carter By & Through Carter*,
    510 U.S. 7 (1993) ........................................................................... Passim

i

*Forest Grove Sch. Dist. v. T.A.*,
    557 U.S. 230 (2009) ........................................................................ 53

*Frank G. v. Bd. of Educ. of Hyde Park*,
    459 F.3d 356 (2d Cir. 2006) ...................................................... 16, 33

*Gagliardo v. Arlington Cent. Sch. Dist.*,
    489 F.3d 105 (2d Cir. 2007) ...................................................... 17, 18

*Grim v. Rhinebeck Cent. Sch. Dist.*,
    346 F.3d 377 (2d Cir. 2003) .............................................................. 38

*J.P. on Behalf of J.P v. City of New York Dep't of Educ.*,
    717 F. App'x 30 (2d Cir. 2017) ......................................................... 31

*Jennifer D. ex rel. Travis D. v. New York City Dep't of Educ.*,
    550 F. Supp. 2d 420 (S.D.N.Y. 2008) ........................................ 17, 18

*Jusino v. New York City Dep't of Educ.*,
    2016 WL 9649880 (E.D.N.Y. Aug. 8, 2016) ..................................... 23

*M.O. v. New York City Dep't of Educ.*,
    793 F.3d 236 (2d Cir. 2015) ........................................... 17, 20, 44, 46

*Muller on Behalf of Muller v. Comm. on Special Educ. of E. Islip Union Free Sch. Dist.*,
    145 F.3d 95 (2d Cir. 1998) ................................................................ 16

*R.B. v. N.Y.C. Dep't of Educ.*,
    2016 U.S. Dist. LEXIS 65938 (S.D.N.Y. May 19, 2016) ................... 24

*R.E. v. New York City Dep't of Educ.*,
    694 F.3d 167 (2d Cir. 2012) ...................................................... 18, 19

*S.Y. v. New York City Dep't of Educ.*,
    210 F. Supp. 3d 556 (S.D.N.Y. 2016) ........................................ 17, 18

*Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*,
    471 U.S. 359 (1985) ..................................................... 17, 18, 51, 53

*Tarlowe v. New York City Bd. of Educ.*,
    2008 U.S. Dist. LEXIS 52704 (S.D.N.Y. July 3, 2008)........................................ 24

*T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*,
    752 F.3d 145 (2d Cir. 2014) ................................................................ 19

*T.P. ex rel S.P. v. Mamaroneck Union Free Sch. Dist.*,
    554 F.3d 247 (2d Cir. 2009) ................................................................ 31

*Walczak v. Fla. Union Free Sch. Dist.*,
    142 F.3d 119 (2d Cir. 1998) ........................................................ 16, 32, 33

*Werner v. Clarkstown Cent. Sch. Dist.*,
    363 F. Supp. 2d 656 (S.D.N.Y. 2005) ................................................ 19

*Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*,
    550 U.S. 516 (2007) ............................................................................ 52

*Wong v. Bd. of Educ.*,
    478 F. Supp. 3d 229 (D. Conn. 2020) ................................................ 32

*Y.F. v. New York City Dep't of Educ.*,
    659 F. App'x 3 (2d Cir. 2016)............................................................. 44

## Statutes

20 U.S.C. § 1400 ................................................................................ 1, 2
20 U.S.C. § 1412 ...................................................................................... 9
20 U.S.C. § 1412 (a)(3)......................................................................... 33
20 U.S.C. § 1415(f)(3)(E)(ii) ................................................................ 19
20 U.S.C. § 1415(i)(2)(C)...................................................................... 38
28 U.S.C. § 1291 ...................................................................................... 1
28 U.S.C. § 1331 ...................................................................................... 1
N.Y. Educ. Law § 4404(1)(c) (McKinney) ........................................... 18

## Rules

Fed. R. App. P. 4(a)(1)(A)....................................................................... 1
Fed. R. App. P. 32(a)(5) ........................................................................ 57
Fed. R. App. P. 32(a)(6) ........................................................................ 57

Fed. R. App. P. 32(a)(7)(B) ........................................................ 57
Fed. R. App. P. 32(a)(7)(B)(iii) ................................................. 57

**<u>Regulations</u>**

34 C.F.R. § 300.304 ................................................................ 18
N.Y. Comp. Codes R. & Regs. tit. 8, § 200 ............................. 40
N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1 .......................... 40
N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(b)(3) ................ 18
N.Y. Comp. Codes R. & Regs. tit. 8, § 200.6 ............. 40, 41, 42, 45

## JURISDICTIONAL STATEMENT

**Basis for the District Court's Jurisdiction**

The District Court had subject-matter jurisdiction over this action under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.* Jurisdiction was also conferred on the District Court by 28 U.S.C. § 1331 because the cause of action arises under the laws of the United States.

**Basis for this Court's Jurisdiction**

This Court has jurisdiction over this appeal under 28 U.S.C. § 1291. The Order on Appeal is a final decision of the United States District Court for the Southern District of New York.

**Timeliness of the Appeal**

The Judgment appealed from was entered on September 27, 2024 [A-121]. Under Fed. R. App. P. 4(a)(1)(A), Appellant's Notice of Appeal was due within 30 days, or no later than October 28, 2024. Appellant's Notice of Appeal was filed on October 25, 2024 [A-122]. Thus, this appeal is timely.

**Assertion of this Court's Jurisdiction**

The Order appealed from is a final decision of the United States District Court. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291.

1

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.  Whether the District Court erred in finding that DOE provided R.D. a FAPE during the 2021-22 and 2022-2023 school years.

2.  Whether this Court should rule that iBRAIN was an appropriate unilateral placement under the *Burlington/Carter* analysis.

3.  Whether this Court should rule that the equities favor the Parent under the *Burlington/Carter* analysis.

## STATEMENT OF THE CASE

This is an appeal from the District Court's Order denying the Parent's Motion for Summary Judgment and granting Defendants' Cross-Motion for Summary Judgment in Civil Case No. 23-CV-2746 (JGLC) (BCM). Plaintiff Rhonda Ambrister, individually and as legal guardian of R.D. (hereinafter "Plaintiff" or "Parent"), filed a Complaint on March 31, 2023, against David C. Banks, in his Official Capacity as Chancellor of the New York City Department of Education, and New York City Department of Education (hereinafter "DOE") for violating the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* [A-10]. Parent sought review of the conclusions of the state administrative process.

On March 16, 2022, Parent filed a Due Process Complaint ("DPC") alleging that DOE's February 2022 IEP denied R.D. a FAPE for the 2021-2022 and 2022-2023 school years; that iBRAIN was an appropriate unilateral placement for R.D.; and that equities favored a full award for R.D.'s placement at iBRAIN, including tuition, related services, and special transportation for the period from February 11,

2

2022, until the conclusion of the 2022-2023 school year. [ECF 25 at R. 0046]. Parent requested funding for iBRAIN tuition for the 2021-2022 and 2022-2023 school years and other relief under the IDEA. [A-44].

In a Prior Written Notice and School Location Letter dated March 30, 2022, thirty-seven days after the implementation date for the February 2022 IEP, DOE summarized the recommendations of the February 2022 IEP and notified Parent of the public school site to which R.D. had been assigned for the remainder of the 2021-2022 S.Y. and the 2022- 2023 S.Y., P.S. 79, The Horan School ("Horan"). [ECF 25 at R. 0018; R. 0046].

Defendants recommended that R.D. be enrolled at Horan, where students have different needs than R.D. and are ambulatory—able to walk without support. [ECF 25 at R. 1094]. Most of the students have autism spectrum disorder, a disorder that requires a different level of support and attention than cerebral palsy, which R.D. has. [ECF 25 at R 1094].

**The Impartial Hearing Officer Proceedings**

A prehearing conference was scheduled for and held on May 24, 2022. [A-45]. An impartial hearing commenced on June 27, 2022, and continued on June 28, 2022. The hearing concluded on July 29, 2022, with closing briefs. [A-45]. On August 29, 2022, the Impartial Hearing Officer ("IHO") issued a Findings of Fact and Decision ("FOFD") for IHO Case No. 225244, which found that DOE offered a

FAPE for R.D. for the 2021-2022 and 2022-2023 school years. [A-45]. Specifically, the IHO found:

> … a review of the DOE's February 11, 2022 IEP revealed that many, if not all of, the areas and skills targeted during music therapy were also addressed through the various related services and special education. Although the testimony of the School Psychologist was significantly lacking in terms of the explanation of exactly how these related services and special education address Student's goals, a review of the IEP fills in the gaps in that testimony.

[ECF 25 at R. 0058].

Yet the School Psychologist, Dorothy Pfeiffer, could not provide sufficient justification for the CSE's failure to recommend music therapy; in response to questions about skills that can be worked on in music therapy, she gave a generic answer that skills would be addressed "through special education and related services." [ECF 25 at R. 0879-0880].

The IHO found that iBRAIN would have been considered an appropriate unilateral placement for R.D. had DOE denied her a FAPE. [A-45]. The IHO found that even if DOE had denied R.D. a FAPE, the equities would require a reduction in the total amount of tuition awarded, or the complete denial of an award, because of a lack of evidence in the record about R.D.'s enrollment at iBRAIN and the Plaintiff's obligation to pay iBRAIN's tuition should she not prevail in the due process hearings. [A-45].

The Parent appealed the IHO's decision to the Office of State Review of the New York State Education Department. [A-45].

**The State Review Officer's Decision**

On December 1, 2022, the State Review Officer ("SRO") issued SRO Decision No. 22-136 relative to Plaintiff's appeal. [A-46]. Neither party appealed the IHO's determination that iBRAIN was an appropriate unilateral placement from February 11, 2022, through the 2022-23 school year. [A-46].

Neither party appealed the IHO's award of an Independent Educational Evaluation in hearing and vision education services and her directive to reconvene the CSE to consider those evaluations upon completion. [A-46].

The SRO affirmed the IHO's finding that DOE offered R.D. a FAPE for the 2021-22 and 2022-23 school years. [A-46]. The SRO noted the parties do not dispute that iBRAIN was an appropriate unilateral placement for R.D. but declined to discuss the issues of the appropriateness of the unilateral placement or whether the equities favored Plaintiff. [A-46].

The SRO found DOE failed to show compliance with the regulatory timeframe for implementing R.D.'s February 11, 2022 IEP. [A-46]. At the same time, the SRO held that although DOE's school location letter was untimely, this did not amount to a "per se" denial of FAPE. [A-46]. The SRO found that "while the district delayed in notifying the parents of the school that the student was assigned to attend

to receive the educational programming recommended in the February 2022 IEP, the district's delay did not result in any harm that would rise to the level of a denial of FAPE." [A-46].

The SRO found that DOE's failure to recommend music therapy did not result in a denial of FAPE. [A-46]. The SRO found the hearing record does not support a finding that R.D. requires hearing education services to provide support in learning sign language. [A-47]. Defendants had evaluative information showing that R.D. would benefit from sign language support. [ECF 25 at R. 0449-0450]. R.D. was assessed for sign language support, and "once sign language was incorporated, [R.D.] showed immediate improvement. She was very interested and looked and attended to the hearing provider as the provider signed. She also maintained her attention, looking and watching the hearing provider sign throughout the rest of the assessment." R.D. was recommended for four 60-minute sessions of hearing education services to help her increase her ability to communicate using signs. [ECF 25 at R. 0450].

**The District Court Proceedings**

On March 31, 2023, Parent filed a Complaint in the District Court. [A-10]. Parent alleged that the IHO and SRO erroneously found that DOE had offered R.D. a FAPE for the 2021-2022 and 2022-2023 school years. [A-23]. Additionally, Parent alleged that the SRO erred in failing to find that iBRAIN was appropriate for R.D.

6

and that the equities favored Parent's claims. [A-23]. Parent moved for summary judgment [A-40], and DOE cross-moved for summary judgment. [A-48].

The Magistrate Judge entered a Report and Recommendation (the "R&R") on August 9, 2024. [A-50]. The Magistrate found that the SRO decision was entitled to deference. [A-63-64]. The Magistrate found that DOE's 2022 IEP was procedurally adequate. [A-64-71]. She found that DOE's delay in sending Parent a school location letter did not constitute a failure to provide a FAPE. [A-65-67]. The Magistrate further found that Plaintiff's pre-determination argument related to music therapy was improperly raised. [A-68-69]. The Magistrate also rejected the argument on its merits. [A-69-71].

The Magistrate found that DOE's IEP was substantively adequate. [A-71-77]. She found the IEP was not inadequate for failure to provide music therapy, vision education services, or hearing education services. [A-73-75]. The Magistrate found that Plaintiff's challenge to the appropriateness of Horan was speculative. [A-75-76]. Finally, the Magistrate found Plaintiff could not address Horan's lack of air conditioning because it was not raised in the DPC. [A-77].

The District Court entered its Opinion and Order on September 27, 2024. [A-111 (the "Order")]. The District Court adopted the R&R in part and modified it in part. [A-111-112, 120]. The District Court denied Parent's motion for summary judgment and granted DOE's motion. [A-113, 120]. The District Court agreed with

the Magistrate that it must defer to the SRO on the substantive adequacy of the IEP. Conversely, the District Court held that it need not defer to the SRO when considering whether the alleged procedural defects amounted to the denial of a right protected by the IDEA. [A-115-116].

The District Court found that DOE's IEP was procedurally adequate despite DOE's untimely notice of school placement and its policy-level pre-determination to refuse to consider music therapy. [A-116-119]. The Court concluded that DOE's untimely school location letter "did not significantly impede Plaintiff's opportunity to participate in the decision-making process." [A-117].

The Court erroneously found it determinative that Parent knew of the 2021-2022 placement at Horan at the end of the prior school year and that Plaintiff failed to argue that she would have acted differently had she received a timely school location letter. [A-117-118]. The District Court agreed with the Magistrate's erroneous conclusion "that the decision not to implement music therapy as a part of R.D.'s IEP was not a policy-level pre-determination that amounts to a significant impediment of Plaintiff's opportunity to participate in the decision-making process." [A-118-119].

The District Court found that DOE's IEP was substantively adequate, rejecting Plaintiff's arguments that DOE "failed to offer R.D. specific services to meet specific needs and that the school placement was inappropriate." [A-119]. The

8

Court refused to consider DOE's failure to provide air conditioning, deciding that Plaintiff did not properly raise the issue. [A-119-120].

On October 25, 2024, Plaintiff filed a timely Notice of Appeal. [A-122].

## STATEMENT OF FACTS

Plaintiff Rhonda Ambrister is the legal guardian of the Student-Plaintiff, R.D. [A-42]. R.D. is classified as a "child with a disability" as that term is defined under the IDEA. [A-42]. DOE is the local educational agency ("LEA") in the City of New York and is responsible for making a FAPE available to children with disabilities between the ages of 3 and 21 who reside in the City. 20 U.S.C. § 1412; [A-42].

R.D. turned 15 during the 2021-22 S.Y. [A-42]. R.D. suffers from a brain injury and has been diagnosed with cerebral palsy and a seizure disorder. [A-42]. R.D. also exhibits characteristics consistent with cortical vision impairment ("CVI"). [ECF 25 at R. 51]. R.D. is nonverbal and uses assistive technology (a switch device) for communication. [A-43]. R.D. is ambulatory but can only walk short distances with support. [ECF 25 at R. 265].

R.D. requires assistance in daily living activities for her safety because of impulsivity, poor safety awareness, and the potential for seizure. [A-43]. Her brain injury has resulted in severe global impairments and delays, which affect her cognition, language, memory, attention, reasoning, abstract thinking, judgment, problem solving, sensory, perceptual, and motor abilities, psychosocial behavior,

physical functions, information processing, and speech. [ECF 25 at R. 302]. Because R.D.'s disability severely affects her physical and cognitive capabilities, she requires an environment that offers highly individualized attention and support via small class size and continual adult supervision throughout the duration of the school day. [ECF 25 at R. 30; R. 40].

R.D. attended iBRAIN during the 2021-22 and 2022-23 S.Y.s. [A-43; ECF 25 at R. 0016]. While attending iBRAIN, R.D.'s educational program consisted of a 12-month extended school year in a 6:1+1 class (with direct instruction); 1:1 Physical Therapy ("PT") five times per week in 60-minute sessions; 1:1 Occupational Therapy ("OT") four times per week in 60-minute sessions; 1:1 Speech-Language Therapy ("SLT") five times per week in 60-minute sessions; 1:1 Vision Education Services ("VES") three times per week in 60-minute sessions; Assistive Technology Services ("AT") in one 60-minute session per week; and Parent counseling/training in one 60-minute session per month. [A-43]. At iBRAIN, R.D. also receives support from a 1:1 paraprofessional and the use of her AT device across all environments. [A-43].

R.D.'s program at iBRAIN also includes Music Therapy twice per week in a 60-minute 1:1 session and, once per week in a 60-minute group session; and 1:1 hearing education services three times per week in 60 minute-sessions. [A-43]. iBRAIN's IEP shows that music therapy, provided by a Board-Certified Music

Therapist, has helped R.D. regulate her emotions, promote independence, choice, and communication skills, and exercise to stimulate functional movement patterns. [ECF 25 at R. 0467]. Goals for music therapy are designed to help R.D. accomplish goals in different domains, as music "has the ability to help [R.D.] regulate, focus, and relax." [ECF 25 at R. 0485-0486].

R.D. initially enrolled in iBRAIN in February 2020, but temporarily relocated to the Bahamas during the COVID-19 pandemic. [ECF 25 at R. 0046]. Upon returning to New York in 2021, R.D. re-enrolled in iBRAIN and was thereafter the subject of a State-level administrative appeal concerning her residency status in New York State for the purposes of eligibility under the IDEA. [ECF 25 at R. 0046]. The New York State Education Department determined that R.D. was not a resident as of September 13, 2021. [ECF 25 at R. 0046]. Yet on February 11, 2022, DOE convened a Committee on Special Education ("CSE") to develop an IEP for R.D. with a projected implementation date of February 21, 2022 (the "February 2022 IEP"), thereby assenting to R.D.'s residency. [A-43]. DOE's February 2022 IEP recommendations included a disability classification of Traumatic Brain Injury ("TBI"), and a 12-month program in a 6:1+1 class in a district specialized school. A-43]. The CSE also recommended that R.D. be provided with five 60-minute sessions per week of individual OT, four 45-minute sessions per week of individual PT, five 60-minute sessions per week of individual SLT, one 60-minute group session per

11

month of parent counseling and training, full time 1:1 paraprofessional services, school nurse services as needed, and an assistive technology device to be used throughout the day. [A-44]. The CSE also recommended that R.D. receive special transportation services, which included a 1:1 paraprofessional, lift bus, air conditioning, and limited travel time. [A-44]. The February 2022 CSE did not recommend music therapy, hearing education services, or vision education services. [A-44]. DOE adopted goals for sign language but failed to recommend hearing education services. [ECF 25 at R. 0051].

As of March 16, 2022, DOE had not provided Plaintiff with a prior written notice and school location letter. [A-44]. The SRO determined that " . . . it must be found that the district failed to demonstrate that its school location letter was timely." [ECF 25 at R. 0026].

## **SUMMARY OF THE ARGUMENT**

Defendants denied R.D. a FAPE for the 2021-2022 and 2022-2023 school years. First, Defendants' February 2022 IEP was procedurally defective. Defendants failed to provide a school location in a timely manner. The February 2022 IEP had an implementation date of February 22, 2022. But Defendants did not provide Plaintiff a School Location letter until March 30, 2022, more than five weeks after the implementation date and nearly seven weeks after the IEP. Thus, on its face, the February 2022 IEP was impossible to implement.

Furthermore, the untimely location notice deprived Parent of her right to participate in the decision-making process. Parent could not investigate DOE's proposed placement in time for R.D. to start school by the IEP implementation date because she did not know what the placement was. Even though the placement was the same as DOE's June 2021 IEP—Horan—the Parent was not aware, nor should it be assumed that they knew, that the placement would stay the same for the February 2022 IEP. DOE created a new IEP in February 2022, which could have involved a new placement. Parent cannot be bound by the placement related to the June 2021 IEP, especially since DOE bears the burden of proof under Prong I of the *Burlington/Carter* analysis.

The District Court erred in finding it dispositive that Plaintiff did not show what she would have done differently had she been timely notified of the DOE placement. It is not Parent's burden to show that DOE failed to provide a FAPE; it is DOE's burden to prove that it did. DOE failed to do so here. The Court further erred in finding that Plaintiff had already indicated that she would not consider a D75 school. This Court has held that a parent's pursuit of a private placement is not a valid basis for denying the parent's claim for reimbursement, even if the parent never intended to enroll the student at a district school.

The February 2022 IEP was procedurally defective because it predetermined the rejection of music therapy. Sound evidence shows that music therapy is essential

13

for students with cerebral palsy to make academic progress. DOE's failure was not simply rejecting music therapy after considering it on its merits, but refusing even to consider it. DOE deprived Parent of her right to participate in the decision-making process by refusing to consider her concerns about the absence of music therapy because, as a matter of district-wide policy, it will not, or cannot, provide music therapy. This is pre-determination, and violates IDEA.

Defendants' February 2022 IEP also was substantively defective. It failed to include music therapy despite the well-established benefits of such therapy for students with cerebral palsy. The IHO improperly credited the testimony of DOE's witness, Dorothy Pfeiffer, who could not justify CSE's omission of music therapy. Ms. Pfeiffer gave only a generic answer that such skills would be addressed "through special education and related services." This testimony does not satisfy Defendants' burden of proof under Prong I.

Defendants also failed to provide a FAPE because they did not provide Hearing Education Services, despite being provided evidence of R.D.'s need for such services and the benefits she received from them. Defendants also failed to provide a FAPE by failing to provide Vision Education Services, despite being provided evidence of R.D.'s need for such services.

Defendants failed to provide a FAPE by failing to provide a placement with air conditioning. Because of R.D.'s seizure disorder, the absence of air conditioning

14

constitutes a serious health risk for her. The District Court erred in refusing to consider this issue because Plaintiff did not raise it in her Due Process Complaint. The District Court had the discretion to review the entire context of R.D.'s educational needs and the school's ability to meet them, including necessary health-related accommodations, and erred by failing to exercise this discretion. Further, DOE already knew of R.D.'s need for air conditioning, as shown by its recommendation of air conditioning in the context of recommended transportation services.

Defendants' placement, Horan, was inappropriate for R.D. The evidence shows that, at Horan, R.D. would have been grouped with autistic children. This grouping violates the mandates of IDEA that students be grouped with other students with similar needs. Further, grouping R.D. with autistic children would have been a health risk for her. The District Court erred in finding that Plaintiff's grouping claim was speculative, as the argument is not that Horan will not properly group R.D., but that it cannot. Defendants provided no evidence, and, therefore did not satisfy their burden of proof, that Horan could implement R.D.'s IEP by explaining how four occupational therapists could serve 280 students. Further, Horan lacked air-conditioned hallways for push-in/pull-out services, and no dedicated area for pull-out speech and language therapy sessions. DOE's self-serving "the school could implement the IEP" statement does not satisfy its burden under Prong I.

15

While the District Court did not address Prongs II and III, the evidence supports granting Plaintiff relief under those prongs, as iBRAIN is an appropriate unilateral placement for R.D., and the equities favor full reimbursement. The IHO and SRO agreed that iBRAIN was appropriate, and Defendants did not appeal either decision. Thus, this Court may rule in Plaintiff's favor under Prongs II and III. In the alternative, Plaintiff requests that this Court remand to the District Court to address those prongs.

## ARGUMENT

### I.     STANDARD OF REVIEW

This Court reviews the District Court's factual findings under the "clearly erroneous" standard and reviews its legal conclusions *de novo. Muller on Behalf of Muller v. Comm. on Special Educ. of E. Islip Union Free Sch. Dist.*, 145 F.3d 95, 102 (2d Cir. 1998).

### II.     IDEA FRAMEWORK

The IDEA ensures that local school districts provide all disabled students with a FAPE that is "reasonably calculated to enable the child to receive educational benefits." *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 363 (2d Cir. 2006) (quoting *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998)). In order to provide a student with a FAPE, school districts must (a) comply with the procedural requirements of IDEA and (b) formulate an IEP for the student that is

16

reasonably calculated to enable him/her to receive educational benefits. *See Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 206–07 (1982); *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005).

When parents believe that the school district denied their child a FAPE, the IDEA permits them to unilaterally enroll their child in a private school and request tuition reimbursement or funding from the district. *S.Y. v. New York City Dep't of Educ.*, 210 F. Supp. 3d 556 (S.D.N.Y. 2016) (citing *M.O. v. New York City Dep't of Educ.*, 793 F.3d 236, 239 (2d Cir. 2015) (per curiam)). The analysis commonly used to determine whether a parent is entitled to funding for their unilateral private school placement is known as the *Burlington/Carter* test, promulgated by the Supreme Court in the seminal cases *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359 (1985), and *Florence Cnty. Sch. Dist. Four v. Carter By & Through Carter*, 510 U.S. 7 (1993).

While many refer to the *Burlington/Carter* standard as a "three-prong" test, some courts have correctly observed that the Supreme Court actually established a two-part test to determine whether a party is entitled to district funding: "(1) was the IEP proposed by the school district inappropriate; [and] (2) was the private placement appropriate to the child's needs." *Jennifer D. ex rel. Travis D. v. New York City Dep't of Educ.*, 550 F. Supp. 2d 420, 429 (S.D.N.Y. 2008) (citing *Gagliardo v.*

17

*Arlington Cent. Sch. Dist.*, 489 F.3d 105, 111–12 (2d Cir. 2007) (citing *School Committee of Town of Burlington, Mass.*, 471 U.S. at 370). If the two-part test is satisfied, the district court is then given broad discretion to consider relevant equitable factors in fashioning relief. *Jennifer D. ex rel. Travis D.*, 550 F. Supp. 2d at 429 (citing *Gagliardo*, 489 F.3d at 112 (citing *Florence County School Dist. Four*, 510 U.S. at 16)). *See also* 34 C.F.R. § 300.304, N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(b)(3).

After the IHO issues a decision on the matter at the administrative level, either party may appeal the decision to the SRO for further review, and then to the state or federal district courts. *S.Y.*, 210 F. Supp. 3d 556 (citing *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 184–85 (2d Cir. 2012) (footnote omitted)); N.Y. Educ. Law § 4404(1)(c) (McKinney)). The district court then conducts an independent *de novo* review to determine whether the school district provided the student with a FAPE, and whether the private placement chosen by the parents was appropriate. *Id.* The district court then uses its broad discretion to determine whether equitable considerations favor relief to the parents, and, if so, what kind of relief is warranted. *Id.*

### III. DEFENDANTS DENIED R.D. A FAPE FOR THE 2021-22 AND 2022-23 SCHOOL YEARS

#### A. The February 2022 IEP was Procedurally Defective

A FAPE is offered to a disabled student when the school district complies with the procedural requirements of the IDEA and through the development of an IEP that is reasonably calculated to enable the student to receive educational benefits. *Board of Educ. of Hendrick Hudson Central School Dist., Westchester County*, 458 U.S. at 206–07; *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 151, 160 (2d Cir. 2014). Procedural violations of the IDEA may amount to a failure to provide a FAPE. *See R.E.*, 694 F.3d at 189–91. Procedural violations entitle parents to reimbursement if they "impeded the child's right to a [FAPE]" and/or "significantly impeded the parents' opportunity to participate in the decision-making process" and/or "caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii); *A.C. ex rel. M.C. v. Bd. of Educ. of The Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 172 (2d Cir. 2009). When there are multiple procedural violations, there may be a denial of a FAPE, even if the violations individually are not a denial of a FAPE. *R.E.*, 694 F.3d 167 (quoting *Werner v. Clarkstown Cent. Sch. Dist.*, 363 F. Supp. 2d 656, 659 (S.D.N.Y. 2005)).

#### 1. Defendants failed to timely provide a school location

Here, Defendants failed to provide R.D. with a FAPE because the February 2022 IEP was procedurally defective as Defendants failed to send a timely School

Location Letter to Plaintiff. Defendants sent a Prior Written Notice and School Location Letter, informing Plaintiff of their recommendation that the February 2022 IEP be implemented at Horan on March 30, 2022, nearly seven weeks after the February 11, 2022 IEP meeting. The February 2022 IEP had an Implementation Date of February 21, 2022. Importantly, Defendants had recommended this school placement at the start of the 2021-2022 school year, and Plaintiff rejected such placement. The SRO determined that " . . . it must be found that the district failed to demonstrate that its school location letter was timely." [ECF 25 at R. 0026].

This failure to send a timely School Location Letter deprived Plaintiff of relevant information necessary to participate in the decision-making process. *M.O.*, 793 F.3d at 244–45; *C.U. v. New York City Dep't of Educ.*, 23 F. Supp. 3d 210 (S.D.N.Y. 2014). Because of Defendants' failure to timely provide Parent with a Prior Written Notice and School Location Letter, Plaintiff was deprived of relevant information about the school location for the 2021-22 and 2022-23 school years. Further, because prior to the February 2022 IEP, R.D. was deemed a non-resident, the date of the IEP, February 11, 2022, was effectively the beginning of the school year for R.D., making DOE's failure even more inexcusable.[1]

---

[1] Critically, in the absence of any evidence, the IHO incorrectly credited "good will" to Defendants when they sent a meeting notice on January 5, 2022 ("no evidence presented that Student ever re-applied to New York City Schools") [ECF 25 at R. 0057]. Any evidence of "re-application" was obviated by DOE's actions by sending a notice and then conducting an IEP meeting for R.D. The IHO note the

Concurring with the R&R, the District Court rejected Plaintiff's argument that DOE's late notice deprived her of the ability to participate in the decision-making process, finding that she did not explain what she would have done differently had she been timely notified. [A-118, citing R&R, A-66-67]. The Magistrate concluded that this was "because, as the SRO correctly observed, plaintiff already knew that R.D. was assigned to Horan for the 2021-22 school year. She was notified of that assignment on June 16, 2021." [A-66] (internal citations omitted).

First, it is well established that, in New York, DOE has the burden of proof under Prong I of the *Burlington/Carter* test. DOE did not prove it provided a FAPE— its IEP, on its face, could not be implemented. It is not Parent's burden to prove that DOE did not provide a FAPE.

Second, while DOE assigned R.D. to Horan in June 2021, that assignment implemented its June 2021 IEP. [ECF 25 at R. 0356]. The February 2022 IEP was new, establishing a new program, to be implemented, at least potentially, at a new placement. The previous IEP and placement should not bind the Parent; otherwise, there would be no purpose in creating a new IEP in February 2022. It does not make sense to conclude that Parent knew R.D. would be assigned to Horan because she

---

"considerably lengthy legal history" regarding R.D., but then imputed to Defendants undeserved "credit" for fulfilling its legal obligation to hold an IEP meeting for R.D. and characterizing it as an attempt to "mitigate any potential claims resulting from an allegation of denial of FAPE." [ECF 25 at R. 0058].

was previously assigned to that school in 2021, an assignment **that Parent rejected**. It is even more egregious to hold the Parent to the previous placement when it is not her burden to prove DOE did not provide a FAPE.

Ultimately, DOE conducted a new IEP meeting on February 11, 2022, created a new IEP with an implementation date of February 22, 2022, and did not notify Parent of R.D.'s placement under the new IEP until more than a month later. It was impossible for the February 2022 IEP to be implemented because of DOE's unilateral failure. That failure cannot be held against Plaintiff, particularly under Prong I.

As further support for its conclusion that DOE's untimely notice did not affect Plaintiff's decision to reject the February 2022 IEP, the District Court found that "it appears that Plaintiff had already made up her mind that she would not accept any District 75 placement for R.D." [A-118, citing R&R, A-66]. First, Plaintiff had no way of knowing that the placement would again be a D75 school; there are other options, including a Non-Public School. More importantly, this Court has held that parents' pursuit of a private placement is "not a basis for denying their tuition reimbursement, *even assuming, as the District contended before the IHO, that the parents never intended to keep [student] in public school*." *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 836–37 (2d Cir. 2014) (emphasis added). Again, it is

not Plaintiff's burden to prove, under Prong I, that DOE failed to provide a FAPE; it is DOE's burden to prove that it did. DOE failed to do so.

Notably, Plaintiff rejected Horan, at least in part, because it could not implement R.D.'s IEP. If this is true, then the result of the District Court's reasoning is that because DOE cannot provide a D75 school that can accommodate R.D.'s management needs, it is completely absolved of the responsibility to provide a timely School Location Letter since Plaintiff has already decided she will not accept a placement that cannot accommodate her daughter. This simply cannot be (and is not) the state of the law.

The Magistrate cited *Jusino v. New York City Dep't of Educ.*,[2] which held that the plaintiffs failed to show how a late Final Notice of Recommendation denied FAPE. [A-67]. However, in that case, despite the untimeliness of the FNR, "Plaintiffs had approximately two weeks to investigate" the assigned school before the start of the school year and enrolled the student at the private placement before the start of the school year. *Id.* The court distinguished *E.H. v. New York City Dep't of Educ.*, 164 F. Supp. 3d 539 (S.D.N.Y. 2016), which "recently held that an FNR issued one business day before the start of the school year denied the parent a meaningful opportunity to participate in the placement process." *Id.* The instant case is more

---

[2] No. 14CIV3617ENVST, 2016 WL 9649880, at *6 (E.D.N.Y. Aug. 8, 2016), *aff'd*, 700 F. App'x 25 (2d Cir. 2017).

akin to *E.H.* Here, the school location letter was not sent until **more than five weeks after** the IEP's implementation date, and **nearly seven weeks after** the date of the IEP. Unlike in *Jusino*, it was impossible for Parent to investigate DOE's placement prior to the effective start of the school year. *Jusino* is inapposite.

The R&R cited *R.B. v. N.Y.C. Dep't of Educ.*, 2016 U.S. Dist. LEXIS 65938, at *30, (S.D.N.Y. May 19, 2016): "Because the record indicates that the Parents were not prejudiced by the lack of prior written notice, the SRO's determination that D.B. was not denied a FAPE on this basis must be affirmed." [A-67]. Yet notably, in that case, the court found that "there is no genuine dispute that the Parents received actual notice of the IEP . . . ." *Id.* at *29-30.

Here, there is no dispute that Plaintiff was not notified of the school location until more than one month after implementation of the IEP was supposed to begin. Again, DOE cannot simply rest on the fact that Plaintiff knew of the previous IEP's school location; that placement was superseded by the February 2022 IEP. Plaintiff had no way to know that the placement would be the same as the previous IEP, and cannot be held to that prior placement, particularly when DOE has the burden under Prong I.

The Magistrate cited *Tarlowe v. New York City Bd. of Educ.*, 2008 U.S. Dist. LEXIS 52704, at *19 (S.D.N.Y. July 3, 2008): "Without any evidence of harm or prejudice resulting from the timing of the notice, plaintiffs have not established that

24

the failure to provide earlier notice of the specific placement denied Zachary a free appropriate public education." [A-67]. That case is distinguishable because, while the plaintiffs there were not given timely notice of school placement, the notice was nonetheless given before the start of the school year, which the court found important. *Id.* at *18 ("An education department's delay does not violate the IDEA so long as the department still ha[s] time to find an appropriate placement . . . for the beginning of the school year in September") (internal citation and quotation marks omitted).

Further, the court noted that "Plaintiffs had the opportunity to attend a parent orientation prior to the start of the school year, [and] could have enrolled him at the DOE placement . . . ." *Id.* at *19. Thus, there was no harm to the plaintiffs. Here, the school location was not given until more than one month after the IEP's implementation date, and well after the effective start of R.D.'s school year. *Tarlowe* is distinguishable.

The Magistrate also cites *Grim v. Rhinebeck Cent. Sch. Dist.*, 2003 U.S. App. LEXIS 18672, at *11 (2d Cir. September 9, 2003): 'there is no suggestion in the record that the Grims would have altered their placement decision had their challenges to the IEP been resolved in a more timely fashion." [A-67]. However, in that case, the parents were not challenging the placement notice, but the consideration of their challenges to the IEP. This Court ruled that, notwithstanding

25

the parents' challenges, the IEPs were adequate. Thus, the timeliness of any resolution of the challenges had no impact on anything. That is not the situation here, where the IEP could not be implemented because DOE did not provide a placement until more than one month after the IEP's implementation date.

Therefore, Defendants failed to provide R.D. with a FAPE because they failed to send a School Location Letter and Prior Written Notice in a timely manner.

## 2. DOE predetermined that it would not provide music therapy

Music therapy has empirical benefits for students with cerebral palsy. One study on the effect of music therapy on the behavior and mood of children with cerebral palsy found that "[m]ore stable mood, greater body coordination and better cooperation in other rehabilitation appeared in children with cerebral palsy after given music therapy."[3] Research strongly shows that music therapy contributes to vast improvements in mood, social ability, cognition, body coordination, and more by offering a comfortable, relaxing environment, which helps children cooperate better.[4] The iBRAIN IEP specifies that music therapy helps R.D. "to regulate her emotions, promote independence, choice, and communication skills, and exercise to stimulate functional movement patterns." [ECF 25 at R. 0208]. Moreover, music

---

[3] Li ZL, Liu ZH, ZhaoY, A Study of Music Therapy on Behavior and Mood of Children with Cerebral Palsy, 2014.

[4] Liu Z, Zhao Y, Application and Prospect of Music Therapy in Rehabilitation of Cerebral Palsy, 2015.

therapy is a "highly preferred activity" that increases her attention to tasks. [ECF 25 at R. 0905].

The plan at iBRAIN, which encompasses a comprehensive approach including music therapy, is beneficial and necessary for R.D.'s educational and therapeutic progress. Music therapy, for instance, has been shown to significantly aid in cognitive and emotional development for students with cerebral palsy, and this was found true for R.D.[5] By omitting these services, the district failed to fulfill the *Rowley* standard of an IEP tailored to confer discernible educational benefits on R.D.

The administrative proceedings found that R.D. could receive the benefits of music therapy from other services provided by the school. [ECF 25 at R. 0058]. This is based on the testimony of DOE's witness, Dorothy Pfeiffer, who testified

---

[5] *See* ECF 25 at R. 0467: In a typical Music Therapy session, [R.D.] first engages with a Hello song to encourage smooth transitions into Music Therapy and to generalize skills within the realm of greetings and communication. After this, [R.D.] typically engages in a song or instrument choice activity. She makes this decision by using her device to communicate her wants. This helps to promote independence, choice, and communication skills. [R.D.] typically chooses 4-5 instruments during a session. [R.D.] also engages in Therapeutic Instrumental Music Performance (TIMP), "the playing of musical instruments in order to exercise and stimulate functional movement patterns" (Thaut). [R.D.] can become dysregulated at times and shows this by spitting, yelling, or throwing instruments. [R.D.] benefits from breaks during MT either going for a stroll around the building in her chair or getting up and walking around the school as well. [R.D.] especially enjoys using the drum, strumming the guitar, and grasping and flipping the rain stick. Sessions typically end with a goodbye song to ensure closure and transitions into her next therapy.

generically that the goals addressed by music therapy at iBRAIN could be addressed in other therapies. However, this vague, generic testimony is not enough to satisfy DOE's burden of proving that it provided a FAPE. Plaintiff reasonably raised concerns about the absence of music therapy; DOE must address those concerns by affirmatively proving that it can provide a FAPE without music therapy; it is not Plaintiff's burden to show that DOE cannot provide a FAPE without it.

More importantly, the issue here is not that DOE considered music therapy on its merits, decided not to provide it, and Parent disagreed with that decision. DOE did not weigh music therapy against other therapies; it refused even *to consider* it, ignoring Parent's concerns, because it had already determined that it would not provide it. It took music therapy completely off the table. This is because, district-wide, DOE has decided that it will not (or cannot) offer music therapy to any of its students.

DOE did not fail to offer R.D. a FAPE simply by failing to provide music therapy, though it did do that. It failed to offer R.D. a FAPE by refusing to even consider music therapy, based on a district-wide policy. This violated IDEA's procedural requirements by depriving Parent of her ability to participate meaningfully in the IEP decision-making process. Parent's concerns and relevant opinions about music therapy were discounted or discarded out of hand, not on the merits of this particular case, but as a matter of district policy.

The exceptional value that music therapy has for treating students with cerebral palsy must be assessed alongside a challenge of pre-determination—that the DOE failed to provide R.D. with a vital and highly pertinent form of therapy because it simply *does not offer* that service and *does not wish to offer* that service. This disregard for the highly specialized needs of students with brain-based injuries amounts to a pre-determination claim precisely because the school cannot offer services uniquely tailored to meeting R.D.'s needs, thus disregarding, as a matter of policy, the guardians' contention that music therapy is an essential component for students with brain-based disability. Far from uniquely tailoring the student's IEP to the needs of a cerebral palsy student, the school district has effectively tailored the IEP to the organizational and curricular restrictions of the school district.

This explains why the CSE responded with silence when confronted with Ms. Tiffany Semm's recommendations for implementing music therapy. [ECF 25 at R. 1029]. And this explains why Ms. Semm summarized that "it seemed . . . like an arbitrary decision [had been made] to rule against [music therapy] for no reason when there were clearly outlined reasons in favor." [ECF 25 at R. 1029]. Ms. Pfeiffer, DOE's witness, corroborated this statement on direct examination when she stated, "Typically, we would recommend that–we would state that the Department of Education is not recommending music therapy." Thus, in DOE's own words, the rejection of music therapy is "typical." This provides direct evidence of a policy-

level determination that music therapy should be categorically dismissed. Ms. Pfeiffer reinforced this statement with a follow-up statement: "Again, I would have to reference [] this particular IEP to see if it was in the notes from the meeting. But just to say that the Department of Education would not be recommending music therapy at that time." [ECF 25 at R. 0871]. Ms. Pfeiffer's reference to the individual IEP immediately becomes hollow because, as bookended in her response, the Department typically states that it is not recommending music therapy *at this time*.

But of course, the school district will probably not recommend music therapy before it has developed the capacity to provide the service. Indeed, Ms. Pfeiffer even confirmed that music therapy is not part of the continuum of services offered by DOE. [ECF 25 at R. 0907–0908]. The logical correlation is that the DOE failed to provide an independent evaluation centered on music therapy. [ECF 25 at R. 0907]. Unsurprisingly, DOE failed to present a trained music therapist at the February 11, 2022, IEP meeting. [ECF 25 at R. 1026]. The District Court rejected Plaintiff's pre-determination argument, stating that it declined "to infer from a set of ambiguous statements by a school psychologist that the DOE has made a policy-level determination dismissing music therapy." [A-118]. Yet Pfeiffer's testimony was not "ambiguous." As discussed above, she referred to DOE's "typical" response to complaints about a lack of music therapy. Based on her follow-up statement, she could not remember the specific case of R.D., yet she could say that DOE would not

offer music therapy. [ECF 25 at R. 0871]. She knew that, without recalling the specifics of R.D.'s IEP meeting, because that is *always* DOE's response to a question about music therapy.

DOE's administrative objection to music therapy amounts to a policy barring contrary recommendations, evoking a sense of the school district's reticence to Applied Behavior Analysis ("ABA") in *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840 (6th Cir. 2004). Indeed, "ABA" was known to have impressive and encouraging results for autistic students, but the school district categorically rejected its implementation, even though the school had developed its curricular program intended for the education of disabled students. At issue in *Deal* was the school district's unwillingness to perceive the parents' recommendations with an "open mind," which ultimately denied the parent meaningful access to the decision-making process. *Id.*; accord. *T.P. ex rel S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 253 (2d Cir. 2009) (citing the *Deal* standard that school districts should have an "open mind" when evaluating parents' recommendations); *see also J.P. on Behalf of J.P v. City of New York Dep't of Educ.*, 717 F. App'x 30, 32 (2d Cir. 2017) (reaffirming the "open mind" standard from *Deal*).

The Sixth Circuit reasoned that "the school district may not . . . decide that because it has spent a lot of money on a program, that program is always going to be appropriate for educating children with a specific disability, regardless of any

evidence to the contrary of the individualized needs of a particular child. A placement decision may only be considered to have been based on the child's IEP when the child's individual characteristics, including demonstrated response to particular types of educational programs, are taken into account." *Deal*, 392 F.3d at 859 (emphasis in the original).

Here, DOE has violated and denied Parent meaningful access to the decision-making process because it has predetermined, as a matter of policy, that music therapy services are not to be recommended. By failing to provide an independent evaluation of R.D.'s music therapy needs, by failing to recommend music therapy as a default, and by failing to offer this vital therapy to students with brain-based injuries, the DOE has not tailored its IEP to the Student's unique needs but has tailored the IEP to meet its own bureaucratic principles. Here, DOE failed to show an "open mind" regarding the guardians' empirical recommendations, but sealed the fate of the matter before the CSE meeting even began.

### B.   The February 2022 IEP was Substantively Inadequate

A FAPE "must include special education and related services tailored to meet the unique needs of a particular child and be reasonably calculated to enable the child to receive educational benefits." *Wong v. Bd. of Educ.*, 478 F. Supp. 3d 229, 244 (D. Conn. 2020) (quoting *Walczak*, 142 F.3d at 122). A disabled student's IEP determinations may not rely on the student's disability classification but must be

based on the student's specific and unique educational needs. *See* 20 U.S.C. § 1412 (a)(3); *F.O. v. New York City Dep't of Educ.*, 976 F. Supp. 2d 499, 525 (S.D.N.Y. 2013).

A CSE must consider multiple factors in developing a student's IEP, including: (1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs." *Frank G.*, 459 F.3d at 363 (quoting *Walczak*, 142 F.3d at 123). "[A] school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement." *Cerra*, 427 F.3d at 195 (internal quotation marks omitted).

### 1. Specific Services

As noted above, a disabled student's IEP determinations may not rely on the student's disability classification but must be based on the student's specific and unique educational needs. *See* 20 U.S.C. § 1412 (a)(3); *F.O.*, 976 F. Supp. 2d at 525. When developing an IEP, the CSE must consider multiple factors, as outlined above. Here, Defendants failed to provide R.D. with a FAPE because the February 2022 IEP was substantively defective and failed to meet R.D.'s specific needs.

First, the February 2022 IEP did not consider R.D.'s academic achievement and learning characteristics, as it failed to incorporate or recommend music therapy,

a therapy known in the scientific community to be critical for students with cerebral palsy.

Indeed, music therapy is a crucial intervention technique used for students with neurodevelopmental disorders, especially cerebral palsy, as is the case here with R.D. Cerebral palsy is a neurological disorder that emerges in infancy or early childhood and affects body movement and muscle coordination.[6] The disorder is caused by damage to or abnormalities inside the developing brain, disrupting the brain's ability to control movement and maintain proper posture and balance. *Id.*

Music therapy is an essential educational intervention used for individuals with cerebral palsy. Neurological music therapy is effective for neurorehabilitation,[7] and improving motor skills is the main goal behind music therapy. *F.O.*, 976 F. Supp. 2d 499. As children with cerebral palsy suffer from impaired movement, any assistance to improve their movement is key in their treatment. Many studies establish that music therapy has considerable benefits for children with cerebral palsy. One study on the effect of music therapy on the behavior and mood of children with cerebral palsy found that "[m]ore stable mood, greater body coordination and better cooperation in other rehabilitation appeared in children with cerebral palsy

---

[6] National Institute of Neurological Disorders, *Cerebral Palsy*: https://www.ninds.nih.gov/health–information/disorders/cerebral-palsy.

[7] Sohei Yanagiwara et al., *Effects of Music Therapy on Functional Ability in People with Cerebral Palsy: A Systematic Review*, 2022.

after given music therapy."[8] Research shows that music therapy contributes to vast improvements in mood, social ability, cognition, body coordination, and more by offering a comfortable, relaxing environment, which helps children cooperate better.[9]

Here, R.D.'s iBRAIN IEP shows that music therapy, provided by a Board-Certified Music Therapist, has helped R.D. regulate her emotions, promote independence, choice, and communication skills, and exercise to stimulate functional movement patterns. [ECF 25 at R. 0467]. Goals for music therapy are designed to help R.D. accomplish goals in different domains, as music "has the ability to help [R.D.] regulate, focus, and relax." [ECF 25 at R. 0485–0486]. That said, Defendants failed to provide music therapy in R.D.'s IEP.

The IHO improperly credited the testimony of Dorothy Pfeiffer, DOE's School Psychologist at CSE 9. Yet Ms. Pfeiffer could not provide sufficient justification for the CSE's failure to recommend music therapy. In response to questions about skills that can be improved by music therapy, she gave a generic answer that such skills would be addressed "through special education and related services." [ECF 25 at R. 0879–0880]. This is especially problematic, as the CSE is

---

[8] Li ZL, Liu ZH, ZhaoY, *A Study of Music Therapy on Behavior and Mood of Children with Cerebral Palsy*, 2014.

[9] Liu Z, Zhao Y, *Application and Prospect of Music Therapy in Rehabilitation of Cerebral Palsy*, 2015.

responsible for creating a program that provides more than de minimis progress, per *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386 (2017). If R.D. can make progress through a service, such as music therapy, she is entitled to that service under federal law.

Defendants disregarded R.D.'s physical development—they failed to recommend Hearing Education Services ("HES"), which represents the straightforward denial of a FAPE. Defendants had access to evaluative information showing that R.D. would benefit from sign language support. [ECF 25 at R. 0459–0450]. R.D. was assessed for sign language support, and "once sign language was incorporated, [R.D.] showed immediate improvement. She was very interested and looked and attended to the hearing provider as the provider signed. She also maintained her attention, looking and watching the hearing provider sign throughout the rest of the assessment." R.D. was recommended for four 60-minute hearing-education sessions to help her increase her ability to communicate using signs. [ECF 25 at R. 0450]. If R.D. can make progress with that service, then its denial is tantamount to DOE denying her the opportunity to make progress, considering her circumstances.

Defendants also failed to consider R.D.'s physical development when they failed to recommend vision education services ("VES"). The CSE was presented with clear evaluative data regarding R.D.'s vision needs. [ECF 25 at R. 0452–0454].

Defendants even incorporated this information into the Present Levels of Performance section of the February 2022 IEP. [ECF 25 at R. 0595–0597]. Ms. Pfeiffer testified that goals or management needs could address areas or skills where specific services are not recommended. Yet the Management Needs section of the February 2022 IEP fails to address R.D.'s specific vision needs. [ECF 25 at R. 0599–0600]. Indeed, the IHO ignored that goals and management needs are not substitutes for related services.

Accordingly, Defendants failed to provide R.D. with a FAPE because they failed to consider necessary factors when creating her IEP, such as music therapy, HES, and VES.

## 2. <u>Air Conditioning and provision of related services</u>

As the SRO had done before, the District Court refused to consider Plaintiff's argument that the absence of air conditioning created a health hazard for R.D. and constituted a denial of FAPE. The Court found Plaintiff failed to explain why she did not raise that issue in her DPC. [A-119-120]. This finding was error.

The District Court's findings regarding air conditioning and the provision of related services in separate locations at the assigned school site appear to hinge on procedural technicalities, rather than the substance of R.D.'s educational needs. This procedural focus misses the broader implications for R.D.'s health and educational experience. R.D.'s condition demands a learning environment that accommodates

her health needs, including air conditioning to prevent overheating, which could negatively impact her health and potentially lead to seizures. [ECF 25 at R. 1100].[10] The District Court's failure to consider the substantive impact of the absence of air conditioning and a proper environment for related services overlooks the critical importance of such accommodations in the context of R.D.'s right to an appropriate education under IDEA.

The SRO's strict adherence to procedural requirements did not diminish the District Court's prerogative to evaluate the administrative record and consider additional evidence independently. *See* 20 U.S.C. § 1415(i)(2)(C);[11] *Grim v.*

---

[10] *See* ECF 25 at R. 1098-1100:

HEARING OFFICER MAZZEI: "Thank you. Go ahead. You may answer the question."

MR. OLTHOFF: "So according to Ms. LeFaivre, where did most of the OT and PT sessions take place?"

MS. AMBRISTER: "In the hallway."

MR. OLTHOFF: "Why did you disagree with those–with that, or why did you think that that was inappropriate for [R.D.]?"

MS. AMBRISTER: "Because there is no air condition, and it could cause seizures."

MR. COUGHLIN: "Objection. Again, this is outside the scope of due process. There's nothing in due process complaint regarding lack of air condition services in the placement school. Additionally, this is information that was contained within the amended complaint that the Parent chose to withdraw from this proceeding."

HEARING OFFICER MAZZEI: "Overruled."

[11] "In any action brought under this paragraph, the court—(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the

*Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 380 (2d Cir. 2003) ("Federal courts reviewing administrative determinations under the IDEA must base their decisions on the preponderance of the evidence, taking into account not only the record from the administrative proceedings but also any further evidence presented before the District Court by the parties"). The SRO's interpretation did not limit the District Court's role, or the issues raised in the initial DPC. The District Court had the discretion to review the entire context of R.D.'s educational needs and the school's ability to meet them, including health-related accommodations integral to R.D.'s ability to benefit from educational services. The District Court erred by failing to do so.

The District Court found that Plaintiff's failure to specifically reference the absence of air conditioning in the DPC "is not a mere technicality, but a procedural protection of fair notice intended to prevent parents from 'sandbagging the school district by raising claims after the expiration of the resolution period." [A-119] (quoting *C.F. ex rel. R.F. v. New York City Dep't of Educ.*, 746 F.3d 68, 78 (2d Cir. 2014) (internal citation and quotation marks omitted)). However, DOE was not "sandbagged." It already knew R.D. needed air conditioning, as it amended the February 2022 IEP to include air conditioning in the transportation

---

evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).

recommendations for R.D. [ECF 25 at R. 0552]. This mechanical application of the pleading rule ignores the realities of the situation here, and resulted in the violation of R.D.'s IDEA rights.

## C.   Horan was Inappropriate

The New York education law, N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1 8 NYCRR 200.l [ww][3][ii] specifically states:

> Group instruction means instruction of students grouped together according to similarity of individual needs for the purpose of special education. The curriculum and instruction provided to such groups shall be consistent with the individual needs of each student in the group, and the instruction required to meet the individual needs of any one student in the group shall not consistently detract from the instruction provided other students in the group.

N.Y. Comp. Codes R. & Regs. tit. 8, § 200.l[ww][3][ii].

When placing students with disabilities together, CSEs must follow N.Y. Comp. Codes R. & Regs. tit. 8, § 200.6[a][3], which states:

> (3) Students with disabilities placed together for purposes of special education shall be grouped by similarity of individual needs as defined in section 200.1 (ww) of this Part, in accordance with the following:
>
>> (i)   The range of academic or educational achievement of such students shall be limited to assure that instruction provides each student appropriate opportunities to achieve his or her annual goals. The learning characteristics of students in the group shall be sufficiently similar to assure that this range of academic or educational achievement is at least maintained.

40

(ii) The social development of each student shall be considered prior to placement in any instructional group to assure that the social interaction within the group is beneficial to each student, contributes to each student's social growth and maturity, and does not consistently interfere with the instruction being provided. The social needs of a student shall not be the sole determinant of such placement.

(iii) The levels of physical development of such students may vary, provided that each student is provided appropriate opportunities to benefit from such instruction. Physical needs shall be considered prior to determining placement to assure access to appropriate programs. The physical needs of the student shall not be the sole basis for determining placement.

(iv) The management needs of such students may vary, provided that environmental modifications, adaptations, or, human or material resources required to meet the needs of any one student in the group are provided and do not consistently detract from the opportunities of other students in the group to benefit from instruction.

N.Y. Comp. Codes R. & Regs. tit. 8, § 200.6[a][3]. Additionally, "A special class shall be composed of students with disabilities with similar individual needs." N.Y. Comp. Codes R. & Regs. tit. 8, § 200.6[h][3].

Defendants here recommended R.D. be enrolled at the Horan School. This school is inappropriate for R.D., because the students have dissimilar needs and are ambulatory—able to walk without support. [ECF 25 at R. 1094]. Furthermore, most of the students have autism spectrum disorder, a disorder that requires a different level of support and attention than cerebral palsy. [ECF 25 at R. 1094]. This class would NOT include students with similar disabilities and needs as required by N.Y.

41

Comp. Codes R. & Regs. tit. 8, § 200.6[h][3], because autistic students have significantly dissimilar needs to R.D. who has been diagnosed with cerebral palsy and a seizure disorder. [ECF 25 at R. 0016]. R.D. depends on support for all activities of daily living. [ECF 25 at R. 0299]. Her brain injury has resulted in severe global impairments and delays, which affect her cognition, language, memory, attention, reasoning, abstract thinking, judgment, problem-solving, sensory, perceptual, and motor abilities, psychosocial behavior, physical functions, information processing, and speech. [ECF 25 at R. 0302]. R.D. is also non-verbal and can only walk short distances with support. [ECF 25 at R. 0265]. As such, R.D. requires high individual support and attention throughout the school day. [ECF 25 at R. 0030].

As N.Y. Comp. Codes R. & Regs. tit. 8, § 200.6[a][3] mandates, "The learning characteristics of students in the group shall be sufficiently similar to assure that this range of academic or educational achievement is at least maintained." The learning characteristics of a student with cerebral palsy and seizure disorder are markedly different from those of an autistic student. Autism spectrum disorder is marked primarily by deficits in social communication and interaction and restricted, repetitive behaviors, interests, and activities.[12]

---

[12] What is Autism, Autism Research Institute, https://www.autism.org/what-is-autism/.

42

While autism involves primarily behavioral challenges, R.D.'s disabilities involve physical limitations, and therefore require vastly different and distinct instruction and attention. For example, an autistic child may have difficulty communicating that they are upset or frustrated, and thus require one-on-one intervention to assist in soothing themself; by contrast, R.D. may have a seizure, requiring urgent and meticulous assistance to save her life. Moreover, grouping R.D. with autistic students will no doubt detract from the opportunities of both R.D. and the autistic students to benefit from instruction; indeed, R.D. requires intensive and individualized attention throughout the school day, thereby inevitably causing a distraction to other students who do not require this high level of attention. Grouping a student like R.D. with autistic students is not appropriate by any means under the statute, or generally.

The Magistrate essentially threw a blanket over the Plaintiff's argument, finding that grouping is not the kind of violation that can be challenged prospectively. [A-75-76]. But the grouping issue here implicates R.D.'s safety. It is not simply that grouping R.D. with other students with similar needs enhances learning (which it does); the issue is that R.D. would be physically in danger in a class with autistic students. While DOE will likely raise the fact that R.D. never attended Horan, this is a Prong I issue. It is DOE's burden to show that R.D. would be properly grouped because it is a statutory requirement. DOE cannot simply throw

43

a blanket over the argument and claim that grouping can never be challenged prospectively. Otherwise, Plaintiff would be forced to place R.D. in a D75 school to prove that she would be in danger, likely by R.D. suffering an injury. This situation is similar to the situation addressed by this Court in *M.O.*, involving a school that could not provide a seafood-free environment to a child with a life-threatening seafood allergy. That case is discussed below.

Case law is clear that it is speculative to argue that DOE *will not* implement the IEP; it is not speculative to argue that *it cannot*. *M.O. v. New York City Dep't of Educ.*, 793 F.3d 236, 245 (2d Cir. 2015); *see Y.F. v. New York City Dep't of Educ.*, 659 F. App'x 3, 5–6 (2d Cir. 2016). Here, Plaintiff is not arguing that Horan will not properly group R.D. in compliance with statutory requirements; she is arguing that the school *cannot*. Since this issue goes to Prong I, it is DOE's burden to prove it *can* properly group R.D. DOE has not done so.

DOE's ability to provide R.D. with a FAPE at Horan appears speculative. Throughout the administrative proceedings, the DOE did not convincingly demonstrate its capability to implement the February 2022 IEP at Horan. Michelle Lefaivre, the Assistant Principal at Horan, failed to provide adequate information about the school's capacity to meet R.D.'s specific occupational or physical therapy mandates. With only four occupational therapists for around 280 students [ECF 25 at R. 0963], Ms. Lefaivre's inability to confirm how many of these students receive

OT raises serious concerns. [ECF 25 at R. 0963]. The assertion that Horan could meet all the OT requirements for these students, including R.D.'s intensive need for five 60-minute sessions weekly, appears speculative and frankly implausible.

If Defendants are abiding by the mandatory statute—and placing R.D. with students who have similar needs—then each student would also be receiving occupational therapy. How could four providers service 280 students on a daily basis? Either the Defendants did not place R.D. with students who have similar needs, in violation of N.Y. Comp. Codes R. & Regs. tit. 8, § 200.6[h][3]), or the school location that the Defendants proposed was not actually providing the services they claimed to have been providing. In either scenario, the school location was wholly inappropriate for R.D.

IDEA requires more than a theoretical capability to implement an IEP—it mandates an appropriate placement capable of realistically meeting a student's unique needs in a practical, everyday educational environment. *Endrew F. ex rel. Joseph F.*, 580 U.S. 386. Plaintiff's arguments focus on a practical assessment, questioning the feasibility and effectiveness of implementing the IEP at Horan in light of R.D.'s specific educational needs and IDEA's substantive requirements.

Defendants also recommended a school location that could not even implement their proposed IEP. For example, the February 2022 IEP mandates that R.D.'s related services be provided using the push-in/pull-out model. [ECF 25 at R.

45

0622–0623]. However Horan has no dedicated area for pull-out speech and language therapy sessions. [ECF 25 at R. 0958]. Further, most pull-out sessions for OT and PT at Horan occur in the hallway, with no air conditioning. [ECF 25 at R. 1098–1099]. Yet Defendants must have believed that R.D. required air conditioning, as they amended their February 2022 IEP to include air conditioning in their transportation recommendations for R.D. [ECF 25 at R. 0552].

The Magistrate found that Plaintiff's challenges to Horan were speculative. [A-75-76]. But relevant precedent is clear: a school's declared ability—or lack thereof—to meet the specific conditions outlined in an IEP is not a speculative matter, but a concrete capability. A poignant illustration of this principle is the analogy of a child with a life-threatening seafood allergy. In *M.O.*, 793 F.3d at 244, this Court observed that "it is not speculative to conclude that an IEP recommending a seafood-free environment for a child with a life-threatening seafood allergy could not be implemented at a proposed school that was not seafood-free" (citing *D.C. ex rel. E.B. v. New York City Dep't of Educ.*, 950 F. Supp. 2d 494, 513 (S.D.N.Y. 2013)). In *D.C.*, the court deemed it non-speculative to conclude that an IEP requiring a seafood-free environment would be impractical at a school that cannot ensure such a safeguard. *D.C. ex rel. E.B.*, 950 F. Supp. 2d at 519. The direct risk to the child's health and safety in an environment that cannot accommodate their medical needs is

clear, and the same principle applies to educational needs that are just as critical to the child's development and well-being.

Expanding this analogy here, it is similarly non-speculative to assert that Horan's inability to provide specialized support tailored to R.D.'s conditions—akin to the necessity for a seafood-free environment for the allergic child—renders it an unsuitable placement. Plaintiff's concerns are not hypothetical but are based on a substantive mismatch between R.D.'s medically documented needs for individualized therapies and accommodations and the school's documented lack of resources or programs to meet these needs. Just as a school environment that cannot guarantee a seafood-free setting for an allergic child is inappropriate, a school that cannot ensure the necessary provisions for a child with cerebral palsy, a seizure disorder, and cortical vision impairment is just as inappropriate.

DOE cannot simply present a witness to make the self-serving statement that the school "can implement the IEP." DOE had nothing to lose by making that statement, since it knew it would not have to implement the IEP. Again, DOE has the burden of proof under Prong I. If a parent raises questions, as Plaintiff did here, DOE should have to prove, with evidence, that it can implement the IEP. DOE must explain how four occupational therapists can served 280 students. Instead, DOE presented a witness who said, "We could have implemented the IEP." When Plaintiff

questioned this conclusory assertion, the administrative officers and the District Court dismissed those questions as speculative. This was error.

The DOE failed to provide R.D. with a FAPE because the school location was wholly inappropriate for R.D.

## IV.  iBRAIN AS AN APPROPRIATE UNILATERAL PLACEMENT FOR R.D.

While the District Court did not address Prongs II and III of the *Burlington/Carter* analysis, the record supports the finding that iBRAIN is an appropriate placement for R.D. and that the equities favor full reimbursement for Plaintiff. Accordingly, Plaintiff requests that this Court address these prongs on their merits. In the alternative, Plaintiff requests that this Court remand to the District Court to address them.

iBRAIN's educational program for R.D. exemplifies a model tailored to her unique needs, arising from cerebral palsy, a seizure disorder, and CVI. [ECF 25 at R. 0319]. The program's strength lies in its personalized approach, evident in its small class size (6:1:1 student-to-teacher ratio) and the provision of a 1:1 paraprofessional, which is crucial for offering the requisite individual attention and support. [ECF 25 at R. 0319].

The comprehensive educational strategy developed for R.D. at iBRAIN, including specialized services such as music therapy, and essential hearing and vision services, exemplifies the depth of personalized attention necessary for R.D.'s

48

development. [ECF 25 at R. 0748]. The targeted benefits of music therapy, as outlined in iBRAIN's IEP, are part of a triad of critical services encompassing hearing and vision support, which is crucial for students with R.D.'s specific conditions. [ECF 25 at R. 0748]. DOE's IEP, however, does not reflect this multifaceted approach, as it omits music therapy and fails to adequately provide for R.D.'s hearing and vision needs, which are intrinsic to her learning and cognitive development. [ECF 25 at R. 0639].

At iBRAIN, music therapy is not merely an extracurricular activity, but a vital part of the curriculum aimed at helping R.D. achieve her potential across various developmental domains. The iBRAIN IEP specifically outlines goals for music therapy to facilitate R.D.'s ability to regulate, focus, and relax—a claim substantiated by the IEP's emphasis on music's therapeutic potential. [ECF 25 at R. 0486]. This is not an isolated service, but part of a more comprehensive array of therapies, each integral to R.D.'s progress, allowing her to engage and interact with the world in ways that are otherwise challenging because of her cerebral palsy, seizure disorder, and CVI.

The benefits of music therapy, as highlighted in the iBRAIN program, are manifold. [ECF 25 at R. 0050, R. 0748]. And the service is tailored to help R.D. hone her executive functioning skills, such as organization, problem-solving, decision-making, and comprehension. [ECF 25 at R. 0050, R. 0748]. It also encourages

49

purposeful vocalizations within the context of therapy, promoting R.D.'s communicative abilities. [ECF 25 at R. 0050, R. 0748]. The program recognizes the unique power of music to help R.D. regulate her emotions, thereby providing a foundation for calm and focused learning. [ECF 25 at R. 0050]. These aspects of the iBRAIN program underscore the inadequacy of the DOE's plan for R.D., which does not address these needs holistically.

In contrast, the DOE's placement at Horan lacks this specialized approach. [R. 0639]. The absence of such therapeutic interventions as music therapy in DOE's IEP for R.D. suggests a gap in understanding her needs and how best to facilitate her learning and development. By choosing iBRAIN, Plaintiff selected a setting where therapies enhance R.D.'s educational experience that caters to her individual needs, amplifying her chances of success. Thus, iBRAIN's program, with its integrative approach and specifically designed music therapy goals, validates Plaintiff's unilateral placement, strengthening her claim for reimbursement, as R.D.'s ability to regulate, focus, and relax is crucial for her educational advancement. [ECF 25 at R. 0208, R. 0486].

### A.   R.D.'s Placement at iBRAIN Aligns with the Legal Standard Under IDEA

Under IDEA, FAPE entails special education and services tailored to the child's unique needs. *Board of Educ. of Hendrick Hudson Central School Dist., Westchester County*, 458 U.S. 176. The program at iBRAIN, with its array of

specialized services, aligns closely with this mandate, offering a level of customization and support that DOE's IEP does not.

Legal precedent grants parents/guardians the right to seek unilateral placement when a public-school does not provide a FAPE. This principle, established in *Burlington* where the Supreme Court recognized the parents' right to secure appropriate educational services for their child outside the public system if the public system fails, was later affirmed by *Carter*, emphasizing that parents are justified in seeking appropriate alternatives when public education cannot meet the requirements of FAPE. *School Committee of Town of Burlington, Mass.*, 471 U.S. 359; *Florence County School Dist. Four*, 510 U.S. 7.

## B.  Judicial and Administrative Acknowledgment of iBRAIN's Appropriateness

Both the SRO and IHO recognized iBRAIN as an appropriate placement for R.D. Despite the SRO's decision favoring DOE, this acknowledgment is a testament to the suitability of iBRAIN's educational environment for R.D.'s needs. Given DOE's failure to provide an appropriate IEP, Parent's decision to enroll R.D. at iBRAIN falls within the parameters established by *Burlington* and *Carter* for unilateral placements. The comprehensive and tailored program at iBRAIN, unlike DOE's inadequate IEP, justifies Parent's decision under the legal framework governing unilateral placements.

The placement of R.D. at iBRAIN is a necessary response to DOE's failure to provide a FAPE, as mandated by IDEA. iBRAIN's educational program, with its individualized approach and inclusion of essential therapies, aligns with the requirements of IDEA and effectively addresses R.D.'s specific educational needs. The recognition of iBRAIN's appropriateness by both the SRO and IHO, coupled with the legal precedent supporting unilateral placements under such circumstances, strongly supports this Court's recognition of iBRAIN as an appropriate placement for R.D. Therefore, this Court should grant the relief sought by Plaintiff, acknowledging iBRAIN as an appropriate unilateral placement and providing the necessary support and reimbursement.

## V. EQUITIES FAVOR FULL REIMBURSEMENT OF TUITION AND SERVICES FOR R.D. AT iBRAIN

Defendants' argument that R.D. came from the Bahamas specifically to attend iBRAIN may seem to suggest a predetermined preference for iBRAIN over the public system. [ECF 32 at 2]. Yet this highlights Parent's proactive measures in the face of DOE's IEP deficiencies. Recognizing the critical role of parents/guardians as equal participants in the development of an IEP, Parent adhered to the procedural requirements under IDEA by participating in the IEP process. *Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 524 (2007). Plaintiff's decision

to place R.D. at iBRAIN was made after due consideration and in direct response to DOE's failure to provide an appropriate educational plan. [ECF 25 at R. 0567].[13]

The Supreme Court in *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230 (2009), highlights the cooperation between school districts and parents in creating and implementing an appropriate IEP. The Court found that, while reimbursement may be ordered when a school district does not provide a FAPE, this is especially true when the district has only offered inadequate services, and there is a history of parental cooperation in seeking appropriate educational services. *Id.* Parent here exemplifies this cooperative spirit by actively engaging with DOE, but turning to iBRAIN—a school equipped to meet the specialized needs of R.D.—after the public system's offerings proved inadequate. The Supreme Court's rulings in *Burlington* and *Carter* bolster the legitimacy of Parent's actions under such circumstances, providing a foundation for reimbursement when unilateral placement becomes necessary because of the public-school's failure to offer a FAPE. *School Committee of Town of Burlington, Mass.*, 471 U.S. at 370; *Florence County School Dist. Four*, 510 U.S. at 12.

---

[13] In her affidavit presented during the administrative proceedings, Mrs. Ambrister testified: "When we moved from the Bahamas to New York City at the end of 2019, the DOE recommended that R.D. attend a public-school. We disagreed with the placement because the public-school could not meet R.D.'s needs." [ECF 25 at R. 0567].

R.D.'s case fits squarely within these parameters, with the SRO and IHO recognizing iBRAIN as an appropriate placement in response to DOE's inadequacies. Moreover, the equitable principles underpinning IDEA affirm Plaintiff's entitlement to reimbursement. The financial burden imposed on Parent because DOE failed to provide a FAPE should not be underestimated. The Supreme Court has recognized the substantial financial strain that families face in securing appropriate education for their children with disabilities. *Florence County School Dist. Four*, 510 U.S. at 15.

The equities here no doubt favor full reimbursement for R.D.'s placement at iBRAIN. By following the procedural requirements of IDEA and seeking an appropriate educational setting for R.D., Parent has acted reasonably and responsibly. The legal precedents, combined with the SRO's concurrence on iBRAIN's suitability, support this Court ordering full reimbursement for R.D.'s tuition and related services, including transportation and nursing costs, at iBRAIN. Such a decision would not only reflect the principles of equity and fairness intrinsic to IDEA but would also guarantee that R.D. receives the specialized education she is legally entitled to.

## <u>CONCLUSION</u>

For the reasons above, the District Court erred in finding that DOE provided a FAPE to R.D. for the 2021-2022 and 2022-2023 school years. The IEP was procedurally defective, as Defendants failed to provide the Parent with a school location in a timely manner, depriving her of her right to participate in the decision-making process. The IEP was further procedurally defective as Defendants refused to consider music therapy based on a district-wide policy, thus predetermining the issue in violation of IDEA.

The IEP was substantively defective, as it failed to include necessary music therapy, Hearing Education Services, and Vision Education Services, despite evidence of R.D.'s needs for such services. The District Court erred in refusing to consider Defendants's failure to provide an air conditioned placement, despite its knowledge that R.D. requires air conditioning because of her seizure condition. Defendants' placement, Horan, was inappropriate as it could not group R.D. with students with similar needs, as required by IDEA, and because there is no evidence that Horan could implement R.D.'s IEP.

This Court should rule that iBRAIN is an appropriate placement for R.D., and that the equities favor full reimbursement to Plaintiff for the costs of R.D.'s placement at iBRAIN. In the alternative, Plaintiff requests that this Court remand to

the District Court to address Prongs II and III.

Dated: January 10, 2025
New York, New York

Respectfully submitted,

/s/ Rory J. Bellantoni
Rory J. Bellantoni (RB2901)
Brain Injury Rights Group, Ltd.
*Attorneys for Plaintiff-Appellant*
300 East 95th Street, Suite 130
New York, New York 10128
(646) 850-5035
rory@pabilaw.org

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,383 words, which is under the 14,000 word limit, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated:  January 10, 2025
      New York, New York

/s/ Rory J. Bellantoni
Rory J. Bellantoni
Brain Injury Rights Group, Ltd.
Attorneys for Appellants
300 East 95th Street, Suite 130
New York, New York 10128
(646) 850-5035
rory@pabilaw.org
